IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT SMITH,                                   Civil Action

        Plaintiff,                            No. 07-1464

      v.                                           Judge McVerry

SPECIALTY POOL CONTRACTORS,

        Defendant.                          JURY TRIAL DEMANDED

**<u>PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**


Samuel J. Cordes
Pa.I.D. #54874

Ogg, Cordes, Murphy & Ignelzi
245 Fort Pitt Boulevard
Pittsburgh, PA 15222
(412) 471-8500

Attorney for Plaintiff

## TABLE OF CONTENTS

I.    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Repeatedly Referring to Smith as a "Jew" and a "Kike" and Reminding Him That
        If Hitler Did a Better Job, Smith Would Not Have Been Born, Creates A
        Hostile Work Environment Because of Smith's Race/Religion. . . . . . . . . . . . . 4

        1.    A reasonable jury could view the evidence as showing Smith's was
                subjected to severe or pervasive racial discrimination because of his
                Jewish ancestry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                a.    The civil rights laws do not contain a "crude environment"
                        exception. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                b.    Defendant daily exposed Smith to  daily racial slurs intended
                        to humiliate , ridicule or intimidate him. . . . . . . . . . . . . . . . . . . 8

                c.    Defendant also  exposed Smith to severe conduct, because of
                        his race. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.    Smith Subjectively Viewed Defendant's Work Environment as Racially
        and Religiously Hostile. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.    Because Rumpf Perceived Smith to be Jewish, Title VII's Religious
        Discrimination Provisions Were Violated, Even if Smith Does Not Actually
        Practice Judaism.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    D.    Material Factual Issues Preclude Summary Judgement on Smith's Retaliation
        Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.    Smith need not show Defendant took an "adverse employment action"
                in response to his complaints of racial/religious harassment. . . . . . . . . . 16

        2.    Factual issues exist over whether Rumpf's actions against Smith were
                caused by Smith's complaints. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## I.      Factual background

Robert Smith worked as a laborer for Defendant Speciality Pool Contractors from March 2006 through the end of July 2006, when he suffered a herniated disc and became disabled. (Plaintiff's Statement of Material Facts Precluding Summary Judgment, ¶1-3).

Shortly after he began his employment, Smith's direct supervisor, Robert "Dale" Rumpf,[1] told Smith he believed Smith was a "Jew," and informed Smith he did not like "Jews" because he was German. (PSMF ¶¶5, 9-11).

Although Smith pleaded he was not Jewish; told Rumpf he was a Catholic; and advised that only his grandparents and mother were Jewish, Rumpf told Smith: "You got 'Jew' blood in you; you are a 'Jew.'" (PSMF ¶¶46-48). According to Rumpf: "a 'Jew' is born to be a 'Jew.'" Thus, Rumpf reasoned, you can be a "Jew" and also a Catholic. It is genetic. (PSMF ¶¶51-52).

Thus, Rumpf started referring to Smith as a "Jew;"  "Hebrew;" "Abraham" and a "Kike" (PSMF¶¶9, 12-16).

Smith's other supervisor  Doubt,  also referred to him as "Jew,"  more than once a week throughout Smith's employment.  (PSMF ¶¶27-28).  Others at Defendant's work site called Smith a "Jew Boy" or "Abraham."  Indeed, they became Smith's nicknames (PSMF ¶¶29-30).

Many times Rumpf would refer to the Holocaust, and told Smith: "Hitler did not do a good enough job because you (Smith) are still alive."  At work, Rumpf would say "Heil Hitler" and raise his hand in a Nazi salute in front of Smith. (PSMF ¶¶20-24).[2]

Smith would receive his weekly pay envelope with the word "Hebrew" written across the top

---

[1] Throughout his employment, Smith was supervised by one of two crew leaders: Rumpf and Jerold Doubt. PSMF ¶5).  Rumpf at times supervised Doubt as well. (PSMF ¶¶5-6).  Rumpf hired Smith, and has the authority to hire people without approval. (PSMF ¶7).  Both Rumpf and Doubt were supervised by Louis Kleespises. (PSMF ¶8).

[2] Doubt as well as other employees heard Rumpf refer to Hitler in front of Smith. (PSMF ¶¶ 23-24).

1

in Rumpf's handwriting . (PSMF ¶¶25-26).

Rumpf's conduct was unending. Rumpf would call Smith a Jew every day–often 5-6 times a day. (PSMF ¶34).  Rumpf characterized the frequency of his "Jew" comments as "a common, everyday thing, just like picking up tools. (PSMF ¶35).

Rumpf did not confine his comments to just the time Smith was directly  working on Rumpf's crew.  Rumpf also referred to Smith as a Hebrew every day whether Smith was on Rumpf's crew, or on Doubt's crew. (PSMF ¶¶38-44).  Likewise, Doubt admits he called Smith a Jew more than once a week throughout Smith's employment. (PSMF ¶45).

Smith first attempted to stop Rumpf and the others by ignoring the comments (PSMF ¶57. When this did not work, Smith told Rumpf to stop.  When Smith complained, Rumpf would stop for a while, but then start again. (PSMF ¶60). After the 100th time Rumpf called Smith "Jew Boy" or Hebrew" Smith responded that Rumpf was a Nazi. (PSMF ¶62).

Smith then asked Doubt what he should do about Rumpf's behavior.  Smith told Doubt he was tired of Rumpf's name calling.  Smith asked Doubt what he should do.  Doubt said he really did not know.  Doubt ask Smith why he put up with Rumpf's conduct.  Smith said he needed a job. Smith told Doubt that most of the comments were made at work, because Smith never associated with Rumpf outside of work.  (PSMF ¶¶70-73).

After Smith complained to Doubt,  Rumpf assigned Smith to tasks other workers did not want to do, such as shoveling mud after a dug pool collapsed  and assigned Smith other menial tasks.  Rumpf had instructed another employee to shovel out the mud first.  The employee refused, then it was assigned to Smith.  When work was slow, Rumpf  told Doubt to "let the Jew stay home." (PSMF ¶¶74-76).  Following Smith's complaints, Rumpf's wife told Smith she hoped he burned in

hell because he was a "rotten, no-good 'Jew.'" Rumpf's wife worked for Defendant on a part time as needed basis. (PSMF ¶¶79-80).

As a result of Defendant's conduct Smith has experienced mental anguish. He cannot watch information about Jewish matters on television, and when he sees such material he gets a warm sensation over face and body–embarrassed to hear any reference to Jews. (PSMF ¶93).

Defendant has **no policy** precluding religious or race harassment.  Nothing in Defendant's policy manual requires a manager to report complains of discrimination. (PSMF ¶¶81-82). Defendant's policy  advises neither managers nor employees where they are to complain if they believe they are being harassed because of either religious or race. (PSMF ¶¶86-87).  Defendant has provided no training to its employees or supervisors on the requirements of equal employment opportunity laws. (PSMF ¶88).   Nothing in Defendant's policies preclude retaliation for reporting either racial or religious harassment.  (PSMF ¶89).

Smith has brought a claim under Section 1 of the Civil Rights Act of 1866, 42 U.S.C. §1981, alleging he was subjected to a hostile environment because of his race (Complaint, Count I), and also subjected to a hostile environment because of his religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), and because of his religion and/or ancestry in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons.Stat.Ann. 955(a). (Complaint, Count II and III).

Defendant moves for summary judgment. It argues  Smith cannot show he was subjected to severe or pervasive race-based harassment,  (Def.'s Brf. at 8), because the conduct occurred over a short time in a rough and tumble construction workplace and because Smith used profanity. (Def.'s Brf. at 11). Defendant also claims Smith was not subjectively offended when was called a Jew, Hebrew and Kike and reminded Hitler did not go a good job, because Smith still is alive. Again,

3

Defendant claims religious/racial slurs are acceptable because Smith used profanity and admitted he was not a shrinking violet. (Def.'s Brf. at 12).

Although Rumpf admitted he viewed Smith to be a "Jew" because he had "Jew blood" in him, Defendant also contends Smith cannot prevail on his Title VII or PHRA claim because Smith does not practice the Jewish religion. (Def.'s Brf. at 16-18). Finally, Defendant claims Smith cannot show he was retaliated against for complaining about the atmosphere. (Def.'s Brf. at 15-16). Defendant is wrong. Plaintiff files this brief explaining why.

## II. Argument

**A.    Repeatedly Referring to Smith as a "Jew" and a "Kike" and Reminding Him That If Hitler Did a Better Job, Smith Would Not Have Been Born, Creates A Hostile Work Environment Because of Smith's Race/Religion**

Section 1 of the Civil Rights Act of 1866, 42 U.S.C. §1981 precludes discrimination because of race in the making and enforcement of contracts. As amended by the Civil Rights Act of 1991, the making and enforcement of contracts includes the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship. 42 U.S.C. §1981(b). Thus, §1981 now encompasses hostile work environment claims, and courts apply the same standards as in a similar claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1); *See CBOCS West, Inc v. Humphries*, __ U.S. __, 128 S.Ct. 1951 (2008)(Section 1981 claims intentionally overlap Title VII analysis); *Verdin v. Weeks Marine, Inc.*, 124 Fed. Appx. 92, 96 (3d Cir. 2005)(same analysis in assessing substantive merit of the claims for §1981 racial harassment and Title VII hostile environment claims).

As Defendant concedes, persons of Jewish ancestry, are a distinct race, and therefore within the protection of 42 U.S.C. §1981. (Def. Brief at 8, n 1, *citing St. Francis College v. Al-Khazraji*,

4

481 U.S. 604, 611-13 (1987), and *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 618 (1987).[3]

Therefore, to show a *prima facie* case of racial harassment under §1981, Smith need only point to facts from which a jury could find (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination was subjectively offensive to Smith; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006); *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265, 276-277  (3d Cir. 2001); *Aman v. Cort Furniture Rental* Corp., 85 F.3d 1074, 1081 (3d Cir. 1996).

The only prongs of Smith's racial harassment *prima facie* case Defendant contests are the first, second and third. (Def.'s Brief at 8-12).  Defendant claims Smith cannot show he was subjected to severe or pervasive race-based harassment, and also claims Smith cannot show he was subjectively offended by Supervisor Rumpf and Doubt's conduct. (Def.'s Brf. at 8-12).[4]

## 1.   A reasonable jury could view the evidence as showing Smith's was subjected to severe or pervasive racial discrimination because of his Jewish ancestry.

Although Defendant refers to the first prong of Smith's *prima facie* case when it contends Smith cannot show he was subjected to intentional discrimination because of his race, Defendant actually focuses  its challenge on the second prong. Defendant claims that Rumpf, Doubt and the co-workers conduct was not sufficiently severe or pervasive. (Def.'s Brf. at 9-10).  Defendant is wrong.

---

[3]Defendant's manager, Rumpf also recognizes this. According to Rumpf, being a "Jew" is genetic.  If a person has "'Jew' blood in him, he is a 'Jew.'" (PSMF ¶¶46-48);  (PSMF ¶¶51-52).

[4]Thus, Defendant concedes material factual issues exist over whether the discrimination would detrimentally affect a reasonable person in the same situation as Smith and also concedes the existence of respondeat superior liability.  If this Court chooses to reach the prong 4 and/or 5 portion despite Defendant's concession, Smith requests an opportunity to address these issues. This Court may not grant summary judgment  on an issue *sua sponte* without giving a party notice an opportunity to oppose the motion. *DL Resources, Inc. v. Firstenergy Solutions Corp*. 506 F.3d 209, 223-24 (3d Cir. 2007);  *Armour v. County of Beaver*, 271 F.3d 417, 433-34 (3d Cir. 2001).

When determining whether the harassing conduct is severe or pervasive, the courts examine all the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys*, 510 U.S. 17, 23 (1993). While these factors are considered, none is specifically required to be present. A court is not to engage in a myopic view of the record and desegregate the components of a hostile environment claim in a manner that robs them of their cumulative effect. *Andrews*, 895 F.2d at 1484; *Durham Life Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999); *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 318 (4th Cir. 2008). Here a reasonable jury could view the conduct to which Smith was exposed to be both severe and pervasive.

> a.      **The civil rights laws do not contain a "crude environment"
> exception.**

At the outset, however, Defendant argues that Smith should have no complaint about being called a "Jew" or "Kike" by his supervisors, because he and others used profanity. Defendant's argument is simply a non sequitur. Smith is not fair game for racial or religious harassment because he works in a construction company, where profanity was used. (Def.'s Brf. at 11)

First, the existence, or use of sexual profanity says nothing about the welcomeness of racial or religious slurs. A person who uses the word "f**k" may nonetheless object to being called a Kike, or being exposed to racial slurs suggesting that people of Jewish ancestry should have been all killed by Hitler, as Smith was in this case.

But even if the kinds of coarseness in Defendants' workplace involved the religious or racial slurs present here, the courts have rejected the view that blue collar workers are somehow less protected from exposure to racial or religious harassment.

6

> Title VII contains no "crude environment" exception, and to read one in to it might vitiate statutory safeguards for those who need it most.

*Sunbelt Rentals, Inc.*, 521 F.3d at 318.

Even when the conduct in the workplace involves the same kind of discriminatory comments at issue before them, the courts have refused to excuse racially or religiously offensive language merely because it happens often.

> The district court was wrong to condone continuing racial slurs on the grounds that they occurred in a blue collar environment...we squarely denounce  the notion that the increasing regularity of racial slurs renders such conduct acceptable, normal, or part of "conventional conditions on the factory floor."

*Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir 1999).

There was undoubtedly a time when, in many parts of the country, the use of racial or religious epithets was common on construction sites . But Defendant offers nothing to explain why Section 1981, or Title VII sanctions the continued existence of such conduct. The civil rights laws were adopted for the express purpose of changing such behavior that long existed.

The scheme Defendant champions would simply freeze in place the *status quo* and subject construction workers to racially and religiously offensive environments as the price of working in those positions. As the Third Circuit long ago recognized:

> While Title VII does not require an employer fire all "Archie Bunkers" in its employ, the law does require that an employer take prompt action to prevent such bigots from expressing their opinion in a way that abuses or offends their co-workers. By informing people that the expression of racist...attitudes in public is unacceptable, people may eventually learn that such views are undesirable in private as well. Thus, Title VII may advance the goal of eliminating prejudices and biases in our society.

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir. 1990).[5]

---

[5]*See also O'Rourke v. City of Providence*, 235 F.3d 713, 735 (1st Cir. 2001)("[T]here s no merit to the city's argument...that it was entitled to a jury instruction that firefighters' conduct should be evaluated in the context of

(continued...)

Indeed, Defendants managers themselves disagree with Defendant's position and understand racially and religiously offensive conduct is not acceptable even in a construction company workplace. (PSMF ¶90-92).

Because the use of profanity in a workplace says nothing about the acceptability of racially and religiously offensive conduct, and because the civil rights laws do not provide a safe harbor for "blue collar" construction sites, the nature of Defendant's business does not permit it to condone the kind of conduct directed as Smith and Defendant's motion for summary judgment should be denied.

**b.     Defendant daily exposed Smith to racial slurs intended to humiliate , ridicule or intimidate him**

Defendant next claims the conduct to which Smith was exposed occurred only for a short time and was not severe. (Def.'s Brf. at 10).  But Defendant's claim simply is inconsistent with the record.  Defendant claims this conduct only occurred for a few short weeks and then stopped when Smith moved to Doubt's crew. But the record shows otherwise.

Smith was exposed to a continuous, and daily barrage of anti-semitic pejoratives, that disparaged both him and his ancestry. Two supervisors referred to Smith in harshly derogatory terms. Rumpf, one of Smith's direct supervisors called him "Jew;" "Hebrew;" "Abraham" and "Kike" every day–often 5-6 times a day.  (PSMF ¶34).  Rumpf admits his "Jew" comments toward Smith were a common, everyday thing, just like picking up tools. (PSMF ¶¶35, 37). Anytime Rumpf needed Smith, he would call out: "Yo, Jew" (RS 122/ln. 10-16, App. Ex. 1).

Rumpf did not confine his comments to just when Smith was directly working on Rumpf's

---

[5](...continued)

blue collar environment..."); *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 194 (4th Cir. 2000)(Unable to discern an 'inhospitable environment' exception to Title VII's mandate that employers not discriminate"); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999)(Rejecting view that standard for sexual harassment varies depending on work environment)

8

crew. (PSMF ¶ 38).  Rumpf also referred to Smith as a "Hebrew" every day whether Smith was on

Rumpf's crew, or on Doubt's crew. (PSMF ¶¶39-40) When Rumpf was not working directly with

Smith, he would refer to Smith as a "Jew" on the walkie-talkies when talking with Doubt, Smith's

other supervisor. (PSMF ¶41). When Rumpf would hear Smith in the background while working

for Doubt, he would say: "Tell that 'Jew' that I said what's up" or "tell that 'Jew' I need this taken

care of" or tell that 'Jew' that I need this done or this done."  (PSMF ¶42).

In the morning, when Smith would be at Doubt's house waiting for the other crew members,

Rumpf would stop by and say: "what's up, 'Jew Boy'" (PSMF ¶¶43-44).    Likewise, Doubt admits

he also called Smith a "Jew" more than once a week. (PSMF ¶¶45).

> **c.      Defendant also  exposed Smith to severe conduct, because of his race**.

In addition to the persistence of Rumpf and Doubt's conduct, the conduct to which these two

supervisors subjected Smith was severe. Smith was subjected to racial slurs of the most demeaning,

degrading and damaging sort. A reasonable jury could find that  Rumpf and Doubt' racial slurs were

aimed to humiliate , ridicule or intimidate him.

Smith was repeatedly dismissed as "the Jew" (PSMF ¶¶14, 16, 25-27, 36, 42-43);  his

supervisors were instructed to "let the Jew do" a particular task; and even his pay envelope was

marked  "Hebrew" to remind him he was somehow different and not accepted. (PSMF ¶25).

In addition, Smith was persistently reminded that "Hitler did not do a good enough job

because you (Smith) are still alive." (PSMF ¶¶20-21).  Rumpf would say  "Heil Hitler" and raise his

hand in a Nazi salute. (PSMF ¶¶21-22).[6]  Such references to Hitler in this context are intended to

---

[6]Although the civil rights laws do not contain a "corroboration" requirement, *See Durham Life*, 166 F.3d at 147,  other employees on Rumpf's work crew heard him make comments to Smith about Hitler. Remarkably, Doubt,

(continued...)

9

arouse fear. Referring to Hitler in front of a person of Jewish ancestry is among the most repugnant of all racist actions because it is itself a reference to an example of a person who murdered Jews for no reason other than their Jewish ancestry. References to Hitler is a symbol of a regime of hatred unparalleled in world history. That regime was dedicated to the oppression of those of Jewish heritage through genocide. *See Lake v. AK Steel Corp.*, 2006 WL 1158610 at *26 (W.D. Pa. 2006); *Cf Tademy v. Union Pacific Corp.*, 520 F.3d 1149, 1159 (10th Cir. 2008); *see also Virginia v. Black*, 583 U.S. 343, 388 (2003)(Thomas, J., dissenting)("[i]n every culture, certain things [both sacred and profane] acquire meaning well beyond what outsiders can comprehend.").

Moreover a jury could infer Rumpf and Doubt's harassment had a greater impact given their supervisory status. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 803 (1998).

Likewise, Defendant seems to suggest the harassment could not have been sufficiently severe because it was not "physically threatening" (Def's Brf. at 11). While the presence of "physical threats undeniably strengthen a hostile work environment claim, such evidence is not required. Names can hurt as much as sticks and stones, and the Supreme Court never has indicated that the humiliation so frequently attached to hostile environments need be accomplished by physical threat or force. *Sunbelt Rentals*, 521 F.3d at 319.

Moreover, Defendant's references to Hitler's failure to properly complete elimination of the Jewish race could be viewed by a reasonable jury to carry with it an implicit threat on the physical safety of the recipient. It is not a large jump to envision a person uninhibited from making such a statement to a person of Jewish ancestry, to actually carry out an act of violence.

Because record evidence shows Smith was subjected to racial slurs on a daily basis, and also

---

[6](...continued)
another supervisor also heard Rumpf make comments about Hitler to Smith. (PSMF ¶¶23-24).

subjected to references to Hitler and the holocaust, a reasonable factfinder could determine he was

subjected to a severe or pervasive discrimination because of his Jewish ancestry and Defendant's

motion for summary judgment should be denied.[7]

**B.      Smith Subjectively Viewed Defendant's Work Environment as Racially and Religiously Hostile**.

Defendant next claims it is entitled to summary judgment because Smith did not subjectively

perceive the work environment as hostile. (Def.'s Brf. at 12). Defendant says because Smith used

profanity he could not have been offended when he was called a "Jew;" or a "Kike." Amazingly,

Defendant infers that people who swear find it welcome to be told that if Hitler had done a better

job in murdering Jews, they would not have been born.

As set forth above, it is not surprising that Defendant cites no authority for its novel

argument, because none exists. First, a person who welcomes profanity does not necessarily welcome

being called a "Kike." Defendant's argument is analogous to contending that an African-American

who uses the term "mother-f*****" must not mind being called a "Nigger." Defendant's argument

is simply absurd.

The subjective element of a hostile environment *prima facie* case examines whether the

conduct was hostile *to the plaintiff*. On a summary judgment record, all this requires is evidence

---

[7]In *Shanoff v. Illinois Dep't of Human Serv.*, 258 F.3d 696 (7th Cir. 2001), Shanoff alleged he was subjected to a hostile work environment because his supervisor repeatedly harassed him because of his religion and race. Shanoff alleged six instances of harassment by the supervisor. Among other things, he alleged he was called a "haughty Jew" and told "I know how to put you Jews in your place." *Id.*, at 698-99. The district court granted summary judgment, finding the harassment incidents were not sufficiently severe or pervasive. *Id.*, at 701. The Seventh Circuit reversed, finding the incidents of harassment rose to the level of an objectively hostile environment. *Id.*, at 705-06. Those incidents included: (1) after Shanoff informed his supervisor that his health was failing because of her conduct, she said she would see to it that "[his] white Jewish ass would be kept down;" (2) the supervisor said "good" after Shanoff said his health was failing; (3) the supervisor prohibited Shanoff from teaching medical students; (4) the supervisor said she "knew how to handle white Jewish males, and once and for all [he] needed to leave and get out of her hair;" and (5) the supervisor said, "I hate everything that you are." *Id.*, at 704-05. The conduct to which Smith was exposed was at least as objective severe or pervasive as in *Shanoff.*

the plaintiff perceived himself to be subject to an abusive environment and to have manifested this. *Jensen*, 435 F.3d at 451; *Spain v. Gallegos*, 26 F.3d 439, 449 (3d Cir. 1994).

In *Spain* the plaintiff testified she perceived the workplace to be abusive. This was sufficient to create a fact question for the jury. *Id.*, 26 F.3d at 449. In *Jenson*, the plaintiff testified that the conduct caused anxiety attacks and stress. This evidence supported a finding of subjective offensiveness. *Id.,* 435 F.3d at 451.

Here, Smith both complained about the workplace environment, and the conduct to which Defendant exposed him caused him to anguish and distress. Even today, he has become so embarrassed by references to Jews that when he sees such references he gets a warm sensation over face and body. The constant exposure to racially offensive comments that derided Smith as inter alia, a "Jews" and a "Kike," made him feel embarrassed by his very heritage itself. As he testified, it was if he was embarrassed to hear any reference to Jews because he constantly was informed by his supervisors that he, as a "Jew" was less than human–that he was disfavored and because of his race was not full and equal member of the workplace. (PSMF ¶93); *See also Aman*, 85 F.3d at 1083.

As set forth above, Smith repeatedly complained about Defendant's conduct both to Rumpf as well as to Doubt. (PSMF ¶¶57-73).

In *Sunbelt Rentals, Inc.*, 521 F.3d 306, a religious hostile environment action, the employer, like Defendant here, responded to the plaintiff's claim that he was subjected to religiously-charged epithets by noting that he "used profane and derogatory language in the workplace." *Id.* at 311. The Fourth Circuit rejected this excuse, noting plaintiff complained about the harassment to his supervisor, and also made it clear comments about his religion were unwelcome. *Id.* at 314.

The Court of Appeals held it was difficult to see how any employee would welcome such

derisive behavior. Because the plaintiff indicated to both management that he found the religiously demeaning conduct to be offensive, an issue of material fact existed on whether the harassment was subjectively unwelcome, despite the fact the plaintiff used profane and derogatory language in the workplace. *Id.* 521 F.2d at 311, 314.

While Defendant is perhaps free to persuade the factfinder that Smith and others' use of non-religious/racial profanity on the work site means he was  not offended by racial/religious slurs a jury would not be required to accept that as a matter of law and on a summary judgment record the Court must accept Smith's testimony that he was offended as a matter of fact. *Spain*, 26 F.3d at 449.

**C.     Because Rumpf Perceived Smith to be Jewish, Title VII's Religious Discrimination Provisions Were Violated, Even if Smith Does Not Actually Practice Judaism.**

Defendant also seeks summary judgment on Smith's religious discrimination claim under Title VII, and his religious and ancestry claims under the Pennsylvania Human Relations Act.. Defendant argues because Smith is not a practicing member of the Jewish faith, he cannot maintain a religious harassment claim under of either Title VII or the PHRA. (Def.'s Brf. at 17-18). Defendant is wrong.

In *Fogleman v. Mercy Hosp, Inc.*, 283 F.3d 561 (3d Cir. 2002), *cert denied*, 537 U.S. 824 (2002), the Third Circuit held the plain language of Title VII directly supports a perception theory of discrimination because the statutory language makes it illegal for an employer to discriminate against any individual because of, in this case, religion." *Id.*, at 571.

The laws therefore focus on the employer's subjective reasons for its actions against the employee, ***so it matters not whether the reasons behind the employer's discriminatory animus are actually correct as a factual matter***. *Fogleman*, 283 F.3d at 571.(emphasis added).

13

Indeed, the Third Circuit used an example nearly identical to the facts of this case to illustrate its holding:

> [I]magine a Title VII discrimination case in which the employer refuses to hire a prospective employee because [it] *thinks that the applicant is a Muslim*. **The employer still discriminates on the basis of religion even if the applicant [it] refuses to hire is not in fact a Muslim**. What is relevant is that the applicant, whether Muslim or not, was treated worse than he otherwise would have been for reasons prohibited by the statute.

*Fogleman*, 283 F.3d at 571(emphasis added).[8]

The EEOC agrees:

> Thomas, who is Egyptian, alleges he has been harassed by his coworkers about his Arab ethnicity. He also has been subjected to derogatory comments about Islam *even though he has told his coworkers that he is Christian*. Thomas' charge should assert both national origin and religious discrimination.

EEOC Compliance Manual, 13-VI (2006) available at http://www.eeoc.gov/policy/docs/race-color.html.

Here, the conduct directed at Smith is based on Defendant's perception of his religious creed. When Rumpf called  Smith "jew boy;" "Hebrew," etc. Smith objected  he was not Jewish, but Catholic. But Rumpf told Smith if he has "Jew" blood in him,  he is a "Jew," irrespective. (PSMF ¶¶46-48). Indeed, Rumpf believes a person can be a "Jew," even if  also Catholic. (PSMF ¶50).

Clearly a reasonable jury could take Rumpf at his word and find that if Rumpf believes Smith to be a "Jew," then the actions Rumpf took against Smith were because of religion, even though Smith told Rumpf he was in fact a Christian. *Fogleman*, 283 F.3d at 571;  EEOC Compliance Manual, 13-VI.

---

[8]*See also* EEOC Training and Technical Assistance Program, Religious Discrimination 62 (2002); EEOC Training and Technical Assistance Program, National Origin Discrimination 48 (2002) available at http://www.eeoc.gov/policy/docs/race-color.html (Discrimination against an individual based on a perception of his or her race violates Title VII even if that perception is wrong).

Moreover, on this record a jury could disbelieve Rumpf's claim that he did not view Smith to be Jewish.  In an Affidavit provided to the EEOC, Rumpf said he did not believe Smith to be Jewish either before or during his employment. (PSMF ¶55).

However, Rumpf then changed his story and testified that he learned from Smith that Smith was Jewish after  Smith began working for Defendant. (PSMF ¶56).  Rumpf's change is an inconsistency a jury could use to determine he engaged in mendacity concerning his actual perception of Smith as a religious Jew, and from that determine Rumpf's current story is a pretext. *See Abramson*, 260 F.3d at 284. Unless Rumpf's story remains consistent beginning at the time it was offered and continuing throughout the proceedings this may be viewed as evidence tending to show pretext. *Id.*; *see also Fuentes v. Perskie*, 32 F.3d 759,  765 (3d Cir. 1994).

Because a reasonable jury could view Rumpf's actual testimony to show his perception of Smith's religion, or because Rumpf told the EEOC one thing and testified to another about his perception of Smith's religious beliefs, Smith's hostile environment claim arises both because of his race and because of religion and Defendant's Motion for Summary Judgment of Counts II and III should be denied.

### D.   Material Factual Issues Preclude Summary Judgement on Smith's Retaliation Claim.

Defendant finally seeks summary judgment on Smith's retaliation claim under 42 U.S.C. §1981. Defendant argues Smith cannot show Defendant took an "adverse employment action" against him (Def.'s Brf. at 14). and that Smith cannot show any action taken against him was because he complained of discrimination. (Def.'s Brf. at 15). Defendant is legally wrong because it states the incorrect standard for showing an adverse action. Defendant is factually wrong because evidence shows Rumpf was annoyed when Smith told him to stop referring to him as a "Jew;" "Hebrew" and

"Kike." and manifested that annoyance by engaging in actions that would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

        **1.**    **Smith need not show Defendant took an "adverse employment action" in response to his complaints of racial/religious harassment.**

Section 1981 encompasses retaliation claims based on complaints of racial discrimination. *CBOCS West*, 128 S.Ct. at 1954. However, Defendant claims Smith must show an "adverse employment action" as an element of a retaliation claim. (Def.'s Brf. at 13, 14). In *Burlington Northern & Santa Fe. Railway Co.*, 548 U.S. 53, 126 S.Ct. 2405 (2006), the U.S. Supreme Court held that a retaliation claim has no such requirement. Defendant remarkably ignores this two year old Supreme Court decision.

In *Burlington*, the Court expressly rejected the "adverse employment action" standard, and rather held that a retaliation plaintiff need only show the employer reacted to his complaints by taking action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id.*, 548 U.S. at 68, 126 S.Ct. at 2415; *see also Moore v. City of Philadelphia*, 461 F.3d 331, 345-46 (3d Cir. 2006).

Applying the correct standard, an issue of fact exists concerning Defendant's reaction to Smith's complaints.

When Smith told Rumpf he did not want to be called a Jew any more, Rumpf assigned Smith to tasks other workers did not want to do, such as shoveling mud after dug pool collapsed, and assigned Smith to do other menial tasks. (PSMF ¶¶74-75).

In addition, when work was slow, Rumpf told Doubt to "let the 'Jew' stay home." (PSMF ¶76), because Jews are all rich and don't need the money. (PSMF ¶¶76-77). Smith lost at least a day of work because of Rumpf's instruction to let the Jew stay home. (PSMF ¶¶78).

16

Defendant claims the assignment of Smith to menial tasks and mud shoveling are not "adverse employment actions" because the duties of laborers include shoveling, including shoveling mud after a pool collapses. (Def.'s Brf. at 15).   The Supreme Court in *Burlington* rejected just such an employer argument.

In *Burlington* the plaintiff was reassigned from forklift duty to standard track laborer tasks in retaliation for her complaints. *Id.*, 548 U.S. at 70, 126 S.Ct. at 2416.   Like Defendant here, the *Burlington* employer argued a reassignment of duties cannot constitute retaliatory discrimination where both the former and present duties fall within the same job description. *Id.* The Supreme Court held otherwise:

> Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee...from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable.

*Burlington*, 548 U.S. at 70-71, 126 S.Ct. at 2416.

Here, Rumpf assigned the mud digging to Smith only after another employer declined to do it because it was more arduous and dirtier than work otherwise performed. (PSMF ¶¶74-75); *see also* (Def.'s Statement of Material Facts, ¶¶70-71). Smith likewise was assigned other menial tasks. As the Supreme Court recognized based a reasonable person in Smith's position could be found to believe assignment of such duties to be a worse job, and therefore be dissuaded from complaining to avoid such assignments. *Burlington*, 548 U.S. at 71, 126 S.Ct. at 2417.

In addition, Smith lost a day of pay while working on the YMCA project. (PSMF ¶78). Defendant claims that this, again is not an adverse action because people were being laid off. (Def.'s Brf. at 14-15). In short, Defendant requests the court to give it the benefit of a favorable inference

17

from two somewhat contradictory facts–something this Court may not do on a summary judgment record.[9] *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

In addition, after Smith complained to Rumpf, the harassment continued a day or two later. (PSMF ¶60). This continuation of the racial/religious harassment by Rumpf and Doubt two days after Smith complained and after the harassment stopped for a day or so,  itself is an adverse action that can support a claim of retaliation. *See Jensen*, 435 F.3d at 449(holding that harassment is an adverse action for purposes of retaliation claim).

Because assignment to the dirtier aspects of his job; the loss of pay from the day of work, and even the mere fact that Rumpf instructed Doubt to "let the Jew stay home" and continued his harassing behavior after Smith complained,  is evidence the jury could find would dissuade a worker from complaining of race/religious discrimination, material factual issues exist and Defendant's motion for summary judgement should be denied.

## 2.    Factual issues exist over whether Rumpf's actions against Smith were caused by Smith's complaints.

Finally, Defendant claims Smith cannot show causation because (1) the timing of his complaints do not appear to be before the adverse actions; and (2) no evidence suggests that Rumpf and/or Doubt were angry by Smith's complaints. (Def.'s Brf. at 16).  But Defendant is wrong.

First after Smith complained to Rumpf in the trailer, Rumpf had a dumbfounded look on his face, as if to say "I can't believe you are in here saying this. (PSMF ¶60).  Rumpf's conduct stopped for a day or so, and then he started it again. (PSMF ¶60).

---

[9]Defendant also tries to make much of Smith's testimony during his deposition that he was not sure what retaliatory treatment he experienced. (Def.'s Brf. at 14). But,  as the Third Circuit has held, such facts do not undercut a finding of retaliation. *See Marra v. Philadelphia Hsg. Aty*, 497 F.3d 286, 307-08 (3d Cir. 2007); *Olson v General Elect. Astrospace*, 101 F.3d 947, 955  (3d Cir. 1996).

18

Evidence that Rumpf began to engage in the same kind of conduct directed at Smith a day or so after Smith complained is sufficient in itself to raise a material factual issue on causation because it is unduly suggestive. An unusually suggestive proximity between the protected activity and an adverse action may itself suffice to establish the requisite causal connection. *Marra*, 497 F.3d at 302; *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989); *Fasold v. Justice*, 409 F.3d 178,189 (3d Cir. 2005). The Third Circuit, as well as judges of this Court have generally held that two weeks or less is sufficient *by itself* to provide an evidentiary basis from which an inference of causation can be drawn.[10]

In addition, a reasonable factfinder could view Defendant's reaction to Smith's complaint as evidence of animus that, coupled with the timing, link Smith's complaint to the conduct. First, after Smith was reassigned to Doubt's crew, Rumpf continuously referred to him as a "Jew," (PSMF ¶67). When work was slow, Rumpf told Doubt to "let the Jew stay home," referring to Smith. (PSMF ¶76). Defendant claims a jury could discount this evidence because Smith did not actually stay home on that occasion. After Rumpf's suggestion, Smith would have been laid off but another supervisor liked the way Smith worked and therefore provided work for Smith. *See* (Def.'s Statement Of Material Facts at ¶¶75-78).

However, Rumpf's reference to "the Jew" when suggesting who should be furloughed is evidence of animus that occurred after Smith complained to Rumpf and a reasonable jury could infer

---

[10]*See Shellenberger v. Summit Bancorp., Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)(10 days unusually suggestive); *Kumar v. UPMC Presbyterian Services*, 2006 WL 1805691 at *10 (W.D. Pa. 2006)(Discharge 12 days after returning from FMLA leave, and employer began investigation 9 days after she returned from FMLA leave satisfies the causal connection prong of retaliation *prima facie* case); *Drozdowski v. Northland Lincoln Mercury*, 2006 WL 2089966 at *6 (W.D.Pa. 2006)(5 days after supervisor had ability to fire and knew about protected conduct creates causal connection); *Straub v. First Media Radio, LLC*, 2005 WL 3158042 at *15 (W.D. Pa. 2005)(Rejection of sexual advance in May 2002 followed in August 2002 by employer writing note that led to plaintiff's discharge would raise suspicion concerning timing of the employer's action).

19

from that suggestion that Rumpf desired to retaliate against Smith for complaining and asking him to stop. *See Marra*, 497 F.3d at 302, 304  (look of disgust in response to protected activity supports finding of causation); *Farrell v. Planters Lifesavers, Inc.*, 206 F.3d 271, 284 (3d Cir. 2000)(change in demeanor supports inference of causation). Causality also can be shown through proof of a "pattern of antagonism" or "direct evidence of a retaliatory animus. *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177-179 (3d Cir. 1997).[11]

Because Rumpf and Doubt, two of Smith's supervisors, continued their harassing conduct after Smith complained; and because of the above evidence of animus, material factual issues arise over the causal link between Smith's complaints and his exposure to additional racial/religious harassment, and Defendant's motion for summary judgement should be denied.

Respectfully submitted,

**OGG, CORDES, MURPHY & IGNELZI**

/S/ Samuel J. Cordes
Samuel J. Cordes
Pa.I.D. #54874

245 Fort Pitt Boulevard
Pittsburgh, PA 15222
(412) 471-8500

Attorney for Plaintiff

---

[11]In addition a reasonable jury could find evidence of animus in the reaction of Rumpf's wife. After this action began, Mrs. Rumpf, who also worked on a part-time, as needed basis for Defendant, encountered Smith outside of work and told Smith she hoped he  burned in hell, because he was "a rotten no-good Jew."  She said this in front of Rumpf's son. (PSMF ¶¶79-80).

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 3rd day of September, 2008 I served a copy of ***Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment*** via first class mail, postage prepaid upon the following:

Kurt Miller
Amy Berecek
Thorp, Reed & Armstrong
One Oxford Centre
301 Grant Street, 14th Floor
Pittsburgh, PA 15219

/S/ Samuel J. Cordes
Samuel J. Cordes